FILED
CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

10 FEB -3 AM 10:

U.S. DISTRICT COURT
EAST ...
OF NEW YORK

ANNA-MARIA THOMAS, Ed.D.

                Plaintiff,

    -against-

NEW YORK CITY DEPARTMENT OF EDUCATION
f/k/a BOARD OF EDUCATION OF THE CITY SCHOOL
DISTRICT OF THE CITY OF NEW YORK; and
JOEL I. KLEIN, Individually and as Chancellor of the
CITY SCHOOL DISTRICT OF THE CITY OF NEW YORK;
ROBERT FINLEY, Individually and in his official capacity
as Principal of Brooklyn High School of the Arts:
JOHN REEDY, Individually and in his official capacity as
Assistant Principal of Brooklyn High School of the Arts; and
DANIEL PARADIS, Individually and in his official
capacity as Teacher at Brooklyn High School of the Arts;
MARGARET LACEY-BERMAN, Individually and in her
official capacity as Principal of Brooklyn High School of the Arts.

                Defendants.

**COMPLAINT**

RCP CASE
CASE No. 10-cv-

Plaintiff demands a
jury trial

COGAN, J.

Plaintiff Anna-Maria Thomas, by her attorney, Joy Hochstadt, P.C., complaining of the

defendants, alleges as follows:

NATURE OF THE CASE

1.    This action is brought pursuant to the Age Discrimination in Employment Act as

amended ("ADEA"), 29 U.S.C. §621 *et seq.*, the Americans with Disabilities Act

("ADA"), 42 U.S.C. §12111 *et seq.*, Title VII of the Civil Rights Act of 1964, as

amended ("Title VII"), 42 U.S.C. §2000-e; Amendment XIV to the United States

Constitution, reached via 42 U.S.C. 1983; the New York State Human Rights Law ("State

Human Rights Law"), New York Executive Law §290 *et seq.*, the New York City

Human Rights Law ("City Human Rights Law"), Section 8-101 *et seq.* of the New York City Administrative Code and Article I of the New York State Constitution.

2.    In this action, Plaintiff, a public school teacher, seeks declaratory and injunctive relief, and damages, arising from the intentional actions of the defendants in discriminating against her because of her age, disability, in retaliating against her because of her opposition to defendants' acts of age and disability discrimination and arising from the intentional actions of the defendants in discriminating against her by failing to grant her reasonable workplace accommodations and directing her to stay at home until she could work without any accommodations causing her to lose salary and causing her pain and suffering. Plaintiff also was unreasonably removed from her position and assigned to the infamous "rubber rooms" based on false allegations where she was confined for almost two years until she was completely exonerated of the fabricated allegations.

JURISDICTION AND VENUE

3.    With respect to the federal claims asserted herein, the Court's jurisdiction is invoked pursuant to 28 U.S.C. §§1331 and 1343(a)(3) and (4) for the violation of plaintiff's federal statutory rights.

4.    Plaintiff's claim for declaratory relief is authorized by 28 U.S.C. §§2201 and 2202.

5.    With respect to the state law claims asserted herein, the Court's supplemental jurisdiction is invoked pursuant to 28 U.S.C. §1367(a).

6.    Plaintiff filed the instant complaint within 90 days of receipt of a Notice of Right to Sue letter from the United States Equal Employment Opportunity Commission ("EEOC").

2

7.    Plaintiff's EEOC Charge number is 520-2008-01160; this charge was filed on April 8, 2008. A right to sue letter was issued by the EEOC, dated November 2, 2009 and was received by Plaintiff on November 5, 2009.

8.    Jurisdiction is conveyed to this Court for the Title VII Retaliation Claims, the Hostile Work Environment and ADA claims by virtue of the Right to Sue notice (available at discovery or as soon as requested) and for ADEA claims by virtue of the filing date of the EEOC Change having been more than 60 days prior to the filing of this Action.

9.    Plaintiff updated/amended/added to her claims of discrimination, retaliation, hostile work environment ("HWE") by amending her EEOC Charge on or before December 4, 2009 to include the continuing wrongs committed by Defendant Margaret Lacey-Berman, current Principal of Brooklyn High School for the Arts, succeeding Defendant Finley who resigned from the Department of Education ("DOE") effective June 30, 2008. This charge cross-references the prior charge and has been also been given the Charge # 520-2010-00596.

10.   The principal place of business of defendant New York City Department of Education f/k/a Board of Education of the City School District of the City of New York ("Department of Education" or "DOE") for the management of its Human Resources and Operations is 65 Court Street Brooklyn, New York 11201; Plaintiff resides at 59 Pineapple Street, Brooklyn, New York 11201, therefore, venue properly lies in the United States District Court for the Eastern District of New York, pursuant to 28 U.S.C. §1391.

3

PLAINTIFF

11.    Plaintiff, Dr. Anna-Maria Thomas, is a citizen of the United States and a resident of Brooklyn, New York, in Kings County. Plaintiff is 64 years old. [1]

DEFENDANTS

12.    The Department of Education is empowered to be the governing body of the City School District of the City of New York ("District") and existing under the laws of the State of New York, and is subject to the provisions of the ADEA, the ADA, State Human Rights Law, and the City Human Rights Law. At all times relevant to this action, the Department of Education has been plaintiff's employer within the meaning of the ADEA, ADA, the State Human Rights Law, and the City Human Rights Law.

13.    Defendant Joel I. Klein ("Klein") is the Chancellor of the District and, as such, is responsible for the operation of the District and its chief executive officer.

14.    Defendant, Robert Finley ("Finley") was at all times relevant hereto, employed by the Department of Education as Principal of Brooklyn High School for the Arts ("BHSA"); Defendant Finley resigned his position in June 2008 and is no longer employed by the DOE.

15.    Defendant John Reedy, ("Reedy") was at all times relevant hereto, employed by the DOE as Assistant Principal Organization at BHSA; Defendant Reedy currently serves as Plaintiff's immediate superior.

---

[1]  Plaintiff is also a named plaintiff in the action entitled *Thomas et al v NYC Dept of Education et al* 09 –cv-5167 (SLT)(RLM), which is a putative class action pending in this Court for which primarily equitable relief is sought. The allegations of discrimination as set forth in this case are separate and distinct from that complaint and do not present common issues of fact or law, which is why this action is being individually commenced.

16.     Defendant Daniel Paradis ("Paradis"), was at all times relevant hereto, employed by the DOE as a Teacher at BHSA up until October 2009 when he was transferred to another school within the DOE.

17.     Defendant Margaret Lacey-Berman ("Berman"), became Principal of BHSA after the resignation of Defendant Finley during the summer of 2008.   While Defendant Berman became Plaintiff's Principal in September 2008, it was not until one year later that Plaintiff was returned to active duty as opposed to suspension and confinement to a teacher reassignment center with no duties.

## FACTUAL ALLEGATIONS

### BACKGROUND

18.     For over thirty five years Plaintiff has been employed by the DOE and has always received satisfactory, if not exemplary, performance evaluations.

19.     In 1984, while assigned to teach at Washington Irving High School in Manhattan, she was elected "Teacher of the Year."

20.     Plaintiff holds New York State teaching licenses in Physical Education which includes Health Instruction, and as Secondary School Guidance Counselor.

21.     Plaintiff also holds New York City teaching licenses in Physical Education and Secondary School Guidance.

22.     Plaintiff began her career with the DOE in April 1973 serving as a Certified Provisional Teacher in a Permanent Substitute capacity.   She was then appointed to a regular tenure-track probationary position in September of 1975 and was conditionally tenured in 1976.

5

23. After five years of service, in 1978, was when Plaintiff earned her Masters degree, she became permanently certified and her tenure became unconditional.

24. Plaintiff's initial assignment was to Boys and Girls High School where she remained for five years.

25. Plaintiff also returned to Boys and Girls HS in 1985 and remained on its faculty until 2002 when she was recruited to the newly established BHSA in September 2002.

CONTINUED DENIAL OF PROMISED POSITION AND DEVLOPMENT OF HWE

26. Plaintiff accepted the position at BHSA in September 2002 on the basis that as the school grew from ninth and tenth grades to a full High School, plaintiff would be appointed as a guidance counselor as the need arose, her express preference over continuing as a Physical Education Teacher as the condition precedent to being recruited from Boys and Girls High School.

27. As each of the next two school years began and the school expanded by an additional grade, Plaintiff waited to be moved into Guidance, i.e. 2003-2004 school year and 2004-2005 school year.

28. Instead Plaintiff was passed over each year for younger, new to the school, Guidance Counselors who were hired by Principal Finley and who had less seniority with the DOE.

29. Plaintiff was fully certified and licensed to work as a guidance counselor. Plaintiff was promised the position to recruit her from Boys and Girls High School where she was a very well-established and respected member to the faculty to a new unproven school, in order to be a guidance counselor, and she was twice denied the position while she saw two younger women were hired to the position she had been promised.

6

30. The first year, 2003-2004, that Plaintiff was passed over for the Guidance Counselor position, a Ms. Miriam Medina, who was in her early to mid-thirties was hired for the position that had been promised to plaintiff to induce her to transfer to BHSA.

31. The second year 2004-2005, that Plaintiff was passed over, a Ms. Sabatino-Joshi, who also was in her early to mid-thirties when she was appointed.

32. Plaintiff has already lost over $20,000.00 in pay differential between a teacher and a guidance counselor and that is not only almost $3,000.00 per annum but impacts Plaintiff's retirement payout level for the balance of her life.

33. Plaintiff did not carp for the assignment however, because another teacher, a Dr. Catherine Cabeza who was promised that she would become Assistant Principal Physical Education, as the school grew, was instead "excessed" out of the school when she reminded Defendant Finley of the condition under which she allowed herself to be recruited to BHSA.

34. This teacher was also a veteran older teacher.

35. Then, Plaintiff was assigned to teach Health to ninth graders by Principal Finley. Plaintiff understood from Principal Finley that he believed that ninth graders could earn another course credit for Health, while Health would be more manageable for the students than adding an additional more rigorous course.

36. Plaintiff had no curriculum materials for ninth graders as the Health Course is always offered for 11th and 12th graders.

37. Plaintiff also found that ninth grade males overall lacked the intellectual and emotional maturity to approach the subject matter which included topics of sexual development,

7

reproductive physiology, and sexual function, in a serious manner.  If Health was to be taught at all, to 9th graders, Plaintiff believed it should not be taught in coeducational classes and informed Principal Finley of same.

38.    Plaintiff received satisfactory ratings for each Annual Professional Performance Review from September 1973 through the most recent evaluation.

39.    From 2003-2005 Plaintiff was assigned an entire program of Health to be taught to ninth graders, for both school years.

40.    Both because of Plaintiff's understanding of the lack of readiness or appropriateness of the 11th and 12th grade Health Curriculum especially for the ninth grade boys and especially in coed classes, and because they were not scheduled to again be enrolled in the traditional Health Class when they reached the 11th and 12th grades, Plaintiff developed an entirely new curriculum for the ninth graders.

41.    Working with no prior lesson plans or even a content framework and to create an entirely new course for her students was extremely time consuming and challenging work which was both physically and mentally exhausting.

42.    Nevertheless, Plaintiff, developed a course appropriate to the grade level and coed setting that could equally be titled "Current Topics in Health and Medicine."

43.    Students appeared to relate to the topics that were being discussed in the media and could be explained at length in class to be meaningful in their own lives.

44.    In September 2005, Finley again appointed another young educator, Drew Martir, as grade advisor to serve in the counseling role.   Mr. Martir could not be appointed as guidance counselor because he did not have the certification; thus he could not have the

8

title nor the pay differential but he did the same work as a guidance counselor.  Mr. Matir was believed to be in his twenties.

45. This was the third time Plaintiff was passed over for a position she was promised if she joined BHSA, each time to a teacher believed to be between 25 and 35 years of age, and without the requisite seniority which is supposed to be controlling.

FURTHER DEVELOPMENT OF THE HWE

46. In October 2006, Dr. Cabeza, was granted an extended Health Restoration Leave, during which she relocated to a warmer climate for approximately two years.

47. Plaintiff was immediately assigned to teach Dr. Cabeza's Physical Education class schedule.

48. A Spanish teacher, Defendant Daniel Paradis, who was working toward a Physical Education teaching license was paired with Plaintiff to team teach Physical Education. Defendant Paradis was about thirty years old at the time.

49. The male students enrolled in Phys. Ed. the periods that Defendant Paradis taught were assigned to him, and the female students enrolled in Phys. Ed. those same periods who were originally assigned to Dr. Cabeza were subsequently assigned to Plaintiff.

50. Defendant Paradis, did not instruct the students in such a manner as to ensure their own and classmates safety in gym and with gym equipment.

51. Because Plaintiff's first responsibility as a pedagogue, is to keep the students entrusted to the school safe, she politely and cautiously suggested to Defendant Paradis, how many of his practices created hazards where students could be injured.

9

52. This included failing to properly stow gym equipment which could cause serious injury to students who attempted to use same, unsupervised.

53. Each time Plaintiff with over thirty years successful experience teaching Phys. Ed., gently and sensitively attempted to mentor Defendant Paradis in his first unlicensed year (in Phys. Ed.) Teaching Phys. Ed., Defendant Paradis became more and more reactive and agitated when Plaintiff interacted with him.

54. Also, beginning from a time when Defendant Paradis was still paired with Dr. Cabeza, he had asked two of her students to assist him with the boys class that he simultaneously taught, to join his group to take his class' attendance. These two girls would then remain with the boys group, not dress for gym, not receive instruction and apparently socialize with the boys who were medically excused from gym that day, or those who were excluded because they were unprepared as to appropriate gym wear.

55. Plaintiff only learned this as she was about to mark these two students absent and class members explained that they were not absent but attended the boys class for the purpose of taking the boys' class attendance.

56. Since their regular non-attendance at class and their performance of a teacher-only duty of making entries on the official attendance records were both highly impermissible, Plaintiff immediately left a Dean with her class and went to retrieve the two students.

57. As Plaintiff entered his class to retrieve her students for whom she was responsible during that period each day, Defendant Paradis became highly irate and made various utterances to indicate that he believed that plaintiff was overreaching her authority in retrieving her own students.

10

58. At one point, after this time, when Defendant Paradis was speaking to Plaintiff in his either dismissive or ultra-defensive (i.e. the best defense is an offense) stances, he threw up to Plaintiff that she was the highest paid teacher in the school.

59. Plaintiff was surprised that Defendant Paradis would have information as to her salary level, and especially that he was preoccupied with that datum.

60. That datum could only have been shared with Defendant Paradis by school administration.

61. Then on Tuesday December 4, 2006, Defendant Paradis, had placed gym equipment that Plaintiff needed to instruct her class, in a common-use room to which all Phys. Ed. Faculty had access.

62. When Plaintiff retrieved the equipment for her class, Defendant Paradis, became enraged.

63. At about 1:30 P.M. on that day, in the corridor near the students' locker room Defendant Paradis, menaced Plaintiff with his body language and approached in a most assaultive manner, looming over her, shouting at her, approaching to attack Plaintiff while shouting at Plaintiff for her having retrieved the equipment from common space that he was most recently regularly using and therefore arrogated to himself was "his office."

64. Defendant Paradis' enraged conduct was extremely threatening, upsetting and frightening to Plaintiff.

65. Defendant Paradis menacing tirade would have resulted in aggravated assault to Plaintiff, had not Dean Alfredo Skelton interceded by placing his body between Defendant Paradis and Plaintiff moving Defendant Paradis away from his proximity to Plaintiff.

11

66. Several students witnessed this unfortunate display of misconduct by Defendant Paradis during which Defendant Paradis slandered Plaintiff.

67. This defamation of Plaintiff had its repercussions in the school; several students thereafter approached Plaintiff over the next several weeks to ask Plaintiff why Defendant Paradis was shouting that Plaintiff was "crazy."

68. While one of the students had observed the incident, two others were not present and had only heard of it from others.

69. Plaintiff promptly reported the incident to Defendant Finley and Defendant Reedy.

70. Plaintiff reported that she no longer felt safe team-teaching with Defendant Paradis and that she would no longer conduct her classes in the same gym facility when he was present.

71. Plaintiff also requested that school administrators admonish Defendant Paradis for his inappropriate conduct unbecoming a professional.

72. Defendants Finley and Reedy took no action regarding this incident whatsoever.

73. Plaintiff continued to feel threatened by Defendant Paradis' volatile behavior.

74. The acquiescence that BHSA administration displayed toward Defendant Paradis behavior, made Plaintiff suspect that there came a time when Defendant Paradis was being encouraged to create the hostile work environment so as to harass Plaintiff.

75. Plaintiff neither interacted with him nor conducted her classes sharing the gym with him.

76. The alternate use of the gym and other Phys. Ed. Facilities was arranged between Defendant Paradis and Plaintiff, almost immediately after Plaintiff was assigned to Dr. Cabeza's former class schedule so that they were never actually teaching in the same

12

place at the same time as Plaintiff, did not believe she could safeguard her students given

Defendant Paradis hazardous teaching and administrative practices.

77. Thus, Plaintiff avoided all contact with Defendant Paradis.

78. Because the BHSA administration did nothing to alleviate Plaintiff's intimidation by Defendant Paradis, and Defendant Paradis' posture was emboldened by refusal of the BHSA administration to confront him on his conduct, Plaintiff experienced an all-encompassing pervasive hostile work environment that she found intolerable.

79. Thus, Plaintiff found it necessary to file a complaint at the 84th Precinct of the New York Police Department in which BHSA is located, describing the menacing and intimidating conduct of Defendant Paradis.

80. Plaintiff also sought the assistance of the Criminal Court of the City of New York, Court Dispute Referral Center at 120 Schermerhorn Street, Brooklyn to seek an Order of Protection.

81. Since Defendant Paradis was prevented from reaching Plaintiff to strike her by being restrained by Alfredo Skelton, who has since entered the Police Academy and may have graduated by now, Defendant Paradis could not be charged with assault and thus an Order of Protection could not be granted.

82. The United Federation of Teachers ("UFT") offered the mediation services of Judy Walker. However, the mediator was unable to resolve the situation, leaving Plaintiff feeling even more threatened.

83. Plaintiff, much later learned that in April of 2007, Defendant Finley, initiated an investigation by the Office of Special Investigations ("OSI") of the DOE alleging that

13

Plaintiff had insulted a student by calling the student "fat" in front of an entire class of students.

84. Plaintiff, also much later learned that the OSI could find no witness in the entire class to substantiate this allegation and that is why Plaintiff did not learn of it for two years.

## UNWARRANTED AND UNREASONABLE ALLEGATIONS AND REASSIGNMENT

85. On November 16, 2007, Plaintiff was directed to report to Defendant Finley's Office before she left for the weekend.

86. Upon arrival she found both Defendants Finley and Reedy awaiting her arrival.

87. Defendant Finley presented the Plaintiff with a white business envelope which contained a letter with the follow body.

88. "Due to an allegation made against you, you are reassigned, effective immediately, pending investigation. Please report to Bernard Palmer, Human Resources ("HR") Deputy Director, at 131 Livingston Street, Room 502.

89. Plaintiff was shocked upon reading the letter and looked up at Defendant Finley perplexed.

90. Defendant Finley's first utterance was, "I have no idea what this is about."

91. Plaintiff then made every effort to show the letter to every faculty member still present BHSA, so that there be no rumor mill as to what had become of her.

92. That was the last time Plaintiff was permitted to enter the school for the next 22 months.

93. Plaintiff sought counsel of the UFT before she reported to DOE HR deputy director.

94. Plaintiff was informed by the UFT that such reassignment meant that the DOE was investigating the possibility of bringing disciplinary charges against the Plaintiff.

14

95. On November 19, 2007, Plaintiff appeared as directed at the office of the HR deputy director and was directed to report to 25 Chapel Street.

96. Plaintiff arrived at Chapel Street, tenth floor and was astounded to find hundreds of teachers confined to the tenth floor.

97. Plaintiff learned that this facility was one of the eight Teacher Reassignment Centers ('TRC') throughout the five boroughs of NYC.

98. Plaintiff reported to this location until June 2009.

99. Plaintiff did not become aware of the charges against her until Wednesday, June 18, 2008. (Seven months after being removed from the classroom.)

100. On December 14, 2007, Plaintiff received a letter that she was required to report to the DOE medical bureau pursuant to NYS Education Law §2568, for a medical exam to determine her fitness for duty.

101. However, the nature of the examination was entirely a psychiatric evaluation to determine her mental fitness for duty.

102. Plaintiff had no idea what either the reassignment, the mental fitness determination, or what the allegations were about – the Kafkaesque nature of the ordeal of the reassignment followed by the psychiatric evaluation – the surreal qualities that suddenly her life could be so upended was destabilizing.

103. The examination on January 3, 2006, as stated, turned out to be solely a psychiatric evaluation by Ann Garner, M.D. the DOE's staff psychiatrist.

15

104. During the examination was the first time plaintiff was informed about the allegations, by Dr. Garner sharing with Plaintiff, Defendant Finley's request for a psychiatric examination of Plaintiff based on several student statements he appended to his letter.

105. Of the six students whose statements were appended to Defendant Finley's request for the exam, two students were not enrolled in any of Plaintiff's classes, yet they asserted that statements were made in class on November 1, 2007 that were highly inappropriate.

106. Of the other four actual students who submitted statements, each one had just received a failing grade on their report card from Plaintiff.

107. As Plaintiff sat in Dr. Garner's office and read the student statements[1] she denied that she had ever made such statements and denied that she had any idea before that moment why she was either at the "rubber room" or subject to a psychiatric exam.

108. Much later at the disciplinary hearing itself, Defendant Finley showed transcripts to indicate that these students were passing Plaintiff's class, though Plaintiff's official records showed she had failed all four students.

109. Plaintiff alleges that Defendant Finley changed their grades to passing, either as a *quid quo pro* for their statements or simply to demonstrate that they had no motive to retaliate against Plaintiff.

110. Dr. Garner found Plaintiff to be "fit for duty."

---

[1] The student statements alleged that Dr. Thomas had taught her students that urine was a good hair conditioner, that semen was a remedy for acne pimples, that the semen being too salty was an indication of dehydration and should be treated with drinking more water *inter alia.*

111. While Plaintiff was, of course, found fit for duty, the ordeal cause untold pain and suffering because, she was told of many other long-tenured teachers who had been taken off the payroll at the stroke of Dr. Garner's pen.

112. Therefore, Plaintiff endured anxiety, trauma and constant fear, sleeplessness and trepidation between the notice December 14, 2007 and January 3, 2008.

113. All these feelings of panic were exacerbated by the Notice itself which stated that Plaintiff would have to sign a waiver if she did not elect to bring a witness and that disciplinary action would be taken if she failed to respond to the directive to appear for the exam.

114. Plaintiff felt so intimidated having to be psychiatrically evaluated that her mood became so low that she feared she might be found unfit.

115. Plaintiff harbored thoughts of being found "unfit" which prompted her to seek out referrals from her personal physicians to obtain two independent psychiatric evaluations prior to seeing Dr. Garner at considerable expense and embarrassment that she had to confide in her physicians that her employer was sending her for a mental status evaluation.

116. Over this crisis, though with humiliating and enraging wounds from it, Plaintiff could turn to adapting herself to confinement at 25 Chapel Street

117. The 'TRC' at 25 Chapel Street had almost three hundred teacher/school staff assigned to this location.

17

118. Newly reassigned teachers were arriving daily. Plaintiff's alphabetized time card number when she first arrived was one hundred ninety-five. Before long (June 2008) her number had risen to two hundred fifty-five.

119. Several members of the 'TRC' became emotionally charged due to the close quarters and the embarrassment to which each of them were subjected while assigned to the 'TRC.'

120. Plaintiff was instructed upon her entrance to the 'TRC' "choose carefully your area and seat." Once she located herself, she was relegated to this area and seat for the duration so as not to exacerbate short tempers in close quarters already debilitated by the circumstances in which they each suddenly found themselves.

121. Sitting in someone else's chair or spot could become a problem and portend danger. Many members in the 'TRC' became territorial about their area and spot, because space was so limited.

122. Everyone assigned to the 'TRC' exhibited fear. Plaintiff knew she did not do anything to be put in the 'TRC' but she had no idea what was happening or why it was happen to her. Fear due this unknown was a constant feeling for Plaintiff.

123. When Plaintiff spoke with her UFT union representative, she was made to feel as if she had no opportunity or chance to clear herself. They made her feel as if she was guilty, end of story.

124. Thus, Plaintiff was made to feel this situation was *fete accompli*. She felt she was doomed.

125. This was the feeling for most, if not all, the members of the 'TRC.'"

18

126.   It appeared as if Plaintiff was guilty without any opportunity to clear herself. The most upsetting issue was not being told why she was sent to this depressing place. Plaintiff had no idea of what she was being accused.

127.   As a result, she sat for seven months in constant fear of what the future had in store for her while the NYC-DOE put her in the 'TRC' all of which served to diminish her emotional stability.

128.   She constantly thought, "What if I am not able to prove my innocence?" She had to fight to keep these thoughts from entering her reality; it was exhausting, and debilitating. Plaintiff tried to maintain her focus on clearing her name and returning to her school.

129.   The UFT union representative encouraged her not to speak with anyone in the 'TRC.' Plaintiff found this to be the wrong road to take.

130.   While she was careful to whom she spoke, she did forge a connection with several members in the 'TRC' and learned much valuable information regarding the procedures which the NYC-DOE put in place to make life unbearable for those sent to the 'TRC.'

131.   Daily a secretary (whose job was to bring papers from the DOE-NYC for members in the 'TRC' to sign) would walk through the 'TRC' into the supervisor's office. Everyone would watch this woman enter and walk the entire distance to the office wondering "IS SHE COMING TO GIVE ME SOMETHING?" This was a daily fear for plaintiff.

132.   On one occasion the secretary did come to hand plaintiff a letter from her principal to sign on Friday, June 13, 2008.

133.   If it was not the secretary, it would be the men in black suits (from the NYC-DOE) who came to interview a member of the 'TRC' regarding their situation. Plaintiff was thankful

for not ever being called into the supervisor's office to speak with these people who were investigators from the Special Commission of Investigation ("SCI") for the DOE. But, the fear of this happening was an ever present daily reality for Plaintiff.

134.   Due to this daily fear (experienced by most if not all educators reassigned to the 25 Chapel Street TRC) of what would be next, the 'TRC' was an unsafe and unhealthy environment to which all its occupants were reassigned. Depressed attitudes were always present. Thus, the health of each person was in jeopardy due to their emotional condition being so poor.

135.   The large number of persons in one location made Plaintiff concerned about staying healthy while each of them was forced to be so closely situated. As a group, they questioned the ventilation in the room. They demanded a health check be done to make sure the ventilation system was clean and clean air was circulating throughout the 'TRC' area.

136.   When Plaintiff entered the 'TRC' location in November 2007, she walked with a slight limp, which she had for about a year prior to her entry to the 'TRC.' Plaintiff had contracted to workout with a personal trainer to improve her limp during this year prior to her entering the 'TRC." There was some improvement in her ambulation as she worked with her trainer prior to her entering the 'TRC." Plaintiff walked every day to and from her 'TRC' location and her home. This, she hoped would continue the progress she was making with eliminating her limp. On occasions Plaintiff felt strong enough to walk to the 'TRC' without a limp. The exercise was good and needed since all she was now doing for six hours and forty minutes was sitting.

20

137. However, it was not long before her ability to ambulate became increasingly challenged.. The progress she had achieved just prior to entering the 'TRC' began to disappear. The pain as she took each step became worse. Thus, she needed to use crutches (January 2008-July 9, 2009) in order to ambulate to and from the 'TRC.' Plaintiff continued to work with her personal trainer to keep her body strong.

138. Plaintiff began doing walking exercises in the hall way of the 'TRC' location in order to exercise the muscles of her right hip and leg during the day. She realized the movement of her right hip was steadily decreasing. She remained on crutches until she eventually had a right total hip replacement on Thursday, July 9, 2009.

139. While Plaintiff was limping for at least a year before entering the 'TRC' her mobility decreased dramatically once her physical activity in the gymnasium ended. Sitting all day exacerbated her condition noticeably; she was then relegated to using crutches to ambulate.

140. At her workplace, plaintiff was subjected to ridicule, intimidation and insults.

141. The behavior of Defendants' and their representatives that was directed at Plaintiff was hostile and abusive and different from the behavior toward other teachers.

142. The Defendants changed the terms, conditions and privileges of that were due and owning to Plaintiff's on the basis of her age, tenured status and years of experience.

143. The physical conditions in the Rubber Room to which Plaintiff was "transferred" also made Plaintiff's work environment hostile.

144. The Rubber Room to which Plaintiff was confined was overcrowded.

145.   The conditions in the Rubber Room to which Plaintiff was confined were nothing at all like the school to which she was assigned.

## THE 3020-A HEARINGS

146.   Plaintiff's 3020-a charges were served to her on June 19, 2008.

147.   The Plaintiff's school board must vote the 3020-a charges on before they can be brought. While the legislature amended the law so that just for NYC they can be brought by a school superintendent, Plaintiff challenges the constitutionality of an amendment to a law granting rights (to tenured teachers) that abridges the due process of the rights to one group of citizens (NYC tenured teachers) as opposed to another group (tenured teachers in the rest of NYS).

148.   While, the DOE states that this geographic difference should be accorded rational basis scrutiny, Plaintiff challenges that an abridgment of the fundamental right of due process must be given strict scrutiny and that amendment Education Law §2590 j should be struck down because equal protection must be given when due process is the issue that is being abridged in one group versus another.

149.   Plaintiff alleges that a more careful investigation by the investigative arm of the DOE, the OSI, Plaintiff would have avoided the entire ordeal of 22 months by determining that they were bogus.

150.   Plaintiff alleges that had the charges been reviewed by a board independent of the employer, as they are mandated to be, Plaintiff qould not to have been charged and not have had to endure the ordeal that she suffered for 22 months.

151. Since the passage of §2590 j, the number of teachers brought up on charges in NYC has exponentially increased. The TRC's have become holding pens for warehousing teachers who have been brought up on poorly investigated and trivial charges.

152. Plaintiff alleges that this is the result of discontinuance of independent review and because the rest of the state tenured teachers still have it, it is unconstitutional for NYC teachers to have lost that right.

153. Arbitrator Mary L. Crangle was appointed and identified to plaintiff on October 21, 2008.

154. Potential arbitrators according to NYS law 3020-a are to be selected within 10 days of receipt of the educator's having informed the New York State Education Department that a hearing is requested.

155. While NYC uses a rotational panel, and preselects the arbitrator, according to the UFT - DOE collective bargaining agreement ("CBA") in which the amended 3020-a allows NYC CBA alone to supercede 3020-a, both the statute and the CBA require the time lines of the statute to be strictly complied with.

156. The appointment of an arbitrator five months later seriously prejudiced Plaintiff, in that it meant another almost five months in which she was kept in trepidation, in limbo, not knowing whether she would ever practice her profession again, five more months in the dreaded and dreadful Rubber room.

157. The arbitrator then held a pre-hearing on November 14, 2008. The pre-hearing by both §3020-a statute and by the UFT contract must be held within 15 days of being assigned the case. The assignment of the arbitrator must be 10 days after the charges are brought.

23

158. The delay of almost five months prejudiced Plaintiff because that was over four months longer that she was made to endure the punitive and pejorative conditions of the TRC.

159. Plaintiff alleges that TRC conditions are intentionally made to induce constructive termination, to get as many tenured teachers to be coerced to relinquish their tenured property rights as possible, to "bust" tenure, to "get rid of" teachers at the top of the pay scale, including plaintiff.

160. Plaintiff's actual hearing which by statute and UFT contract must begin within 15 days after the pre-hearing began February 10, 2009.

161. This non-compliance severely prejudiced Plaintiff in that it caused her to be confined to the horrid TRC for almost three months longer than either the 3020-a statute or the UFT contract permit.

162. All these unlawful delays seriously compromised Plaintiff's health and prevented her from engaging in the adequate exercise she could maintain as an active Phys. Ed. Teacher.

163. If it was no causality to the further physical pain and suffering she enduring leading up to and recuperating from a right hip replacement, it was certainly contributory.

164. Plaintiff's actual testimonial hearings began February 10, 2009.

165. Plaintiff's hearings were concluded on June 24, 2009. By statute and by UFT contract the hearings must be completed within 60 days of the commencement of their commencement.

166.   Plaintiff was seriously compromised by the further non-compliance of an over four month
       duration to the hearing[2], as that non-compliance meant more than two additional months
       Plaintiff was forced to be degraded and humiliated by having to report to the "rubber
       room" as the TRC is called for additional months.

167.   The conduct of the hearings over 135 days rather than the 60 in which they are mandated
       to be concluded, was excruciating for Plaintiff, to have to return again and again to hear
       intentional deceit spewed at her again and again.

168.   The DOE's attorney did not comport herself as professional civil servant interested in
       serving all the people of NYC, instead she growled at Plaintiff, constantly called her a liar
       and treated her with utter disrespect.  It was as if the more she "beat up" on plaintiff the
       better her case would be, and the more likely that she would win it.

                    THE DECISION AND THE CULTURE OF THE THEFT OF TENURE

169.   Plaintiff was completely cleared of all charges on July 13, 2009.

170.   Plaintiff alleges that Defendant Klein has created an actual or subliminal incentive for
       Principals to bring disciplinary charges against older teachers who are at the top of the
       pay scale.

171.   Plaintiff alleges that Defendant Finley's egregious attempt to destroy plaintiff's property
       interest in her life tenure, was a direct result of Defendant Klein's overt statements that
       the system needs "new blood," to "clean house of the old ways" and teachers "wedded to

---

[2] Arbitrators are retained to work five days per month for ten months a year and two days each in July and August,
though the 3020-a statute requires that hearings be held on consecutive days until completed.   However,
"consecutive" is then defined as any five days in a two week period.

old methods" are all signals to purge the system of veteran tenured teachers at the top of the pay scale.

172. Plaintiff alleges that tenure, a property right, should not be undermined for incumbent tenured teachers who have already earned and been granted tenure, but that is what Defendant Klein is intentionally and unlawfully doing. .

173. Plaintiff alleges what was done to her for more than 22 months was a violation of her civil rights under color of state law.

174. Plaintiff alleges that Defendant Finley encouraged the students to whisper behind her back as they went around and signed a petition to have her fired.

175. Plaintiff alleges that Defendant Finley conspired with students (whom Plaintiff failed) to lie in return for changing their grade to passing.

176. Plaintiff demands that the Courts must enforce compliance with the time lines of 3020-a to prevent her agony from being visited on numerous other teachers unwarrantedly brought up on charges, and that she receive just compensation for having had to wrongfully endure the pain.

177. Plaintiff demands that §2690 j must be ruled unconstitutional so that independent review (due process) is available to all NYS tenured teachers not only the ones outside NYC.

## RETURN TO SCHOOL ASSIGNMENT

178. Plaintiff was returned to active service at her school on September 8, 2009.

179. Defendant Berman, the current Principal of BHSA, informed Plaintiff that she had no program for her.

180. Plaintiff was assigned to Defendant Reedy to assign her on a daily basis, as needed.

181.   Though plaintiff was the senior-most teacher in the entire school, and should have been given her preferred assignment within her license areas, she was assigned to answer the telephones as the school's operator.

182.   Defendant Berman stated that she would not pay Plaintiff to answer the phone.

183.   Plaintiff alleges that she was being treated not as a wronged teacher who was completely exonerated, but as a pariah who was now tainted for having been reassigned and brought up on charges, even through she was wrongfully accused to begin with, and completely cleared..

184.   As a result, Plaintiff's professional character is now called into question.  Her credibility as an educator is now tarnished by the treatment of this new principal, Defendant Berman.

185.   Plaintiff alleges her rights continue to be violated.

186.   Plaintiff worked as the school's telephone operator and was assigned two Yoga classes to teach by Defendant Reedy,.

187.   When Defendant Berman learned that Plaintiff was assigned two yoga classes, she questioned the plaintiff's orthopedic clearance for gym activities and sent her to the medical bureau for clearance.

188.   When she went for clearance, the medical bureau denied her clearance due to the fact that her physician did not want her to have unrestricted activities quite so soon after her orthopedic surgery (right hip replacement).

189.   Plaintiff requested to be programmed for Health classes; which was her full program for several years before she was reassigned.

190.    Defendant Berman denied her the request for a Health Program and continued to have it taught by another teacher.

191.    Plaintiff applied for a workplace accommodation under Title 1 the ADA, so that for the balance of the fall semester she could teach Health as she had done for several years prior to the unwarranted and painful disruption to her career.

192.    Plaintiff was denied the accommodation based on the Defendant Berman stating to the Medical Bureau that she needed Plaintiff to teach a Phys. Ed. Program, despite Plaintiff's assertion that Health is also taught by a Phys. Ed. Teacher.

193.    Despite the above stated need, Defendant Berman, also denied Plaintiff's special accommodation request.

194.    Defendant Berman then sent Plaintiff to the Medical Bureau stating that she needed Plaintiff to teach Phys. Ed.

195.    The Medical Bureau improperly used plaintiffs request for special accommodation as an excuse to find her unfit for duty effective November 17, 2009.

196.    Defendant Berman removed Plaintiff from the payroll and directed her to remain at home without pay until she was fit to teach the gym class.

197.    Plaintiff lost wages from November 19, 2009 until January 8, 2010 because Defendant Berman reiterated, "I am not going to pay you to answer the phone."

28

## FIRST CLAIM
### Pursuant to ADEA, 29 U.S.C. §621 *et seq.*

198.   Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 197 of the complaint with the same force and effect as though fully set forth herein.

199.   The provisions of the ADEA are designed to protect persons from aged-based discrimination.

200.   Plaintiff is 64 years old.

201.   Plaintiff was discriminated against because of her age.

202.   The aforesaid actions of defendants in harassing plaintiff, creating a hostile work environment, initiating disciplinary charges seeking plaintiff's termination, were all undertaken to attempt to force plaintiff to resign or retire earlier than she would otherwise wish to, and were undertaken because of the plaintiff's age and/or because she opposed defendants' illegal acts of age discrimination, all in violation of the ADEA.

203.   All of defendants' acts of discrimination and retaliation in violation of the ADEA, were willful and intentional.

204.   Plaintiff has satisfied all of the procedural and administrative prerequisites to suit as set forth in 29 U.S.C. §§626(d) and 633(b).

205.   As a result of the defendants' discrimination and retaliation against plaintiff on the basis of her age and opposition to age discrimination,  plaintiff has suffered lost wages plus interest and has endured extreme pain and suffering for more than two years now.

## SECOND CLAIM
### Pursuant to ADA, 42 U.S.C. §12111 *et seq.*

206. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 197. of the complaint with the same force and effect as though fully set forth herein.

207. The provisions of the ADA are designed to protect persons from disability-based discrimination.

208. Plaintiff suffers from a physical disability, specifically a hip dysfunction that required a total right hip replacement and the resulting short and long term disability.

209. Plaintiffs' disability started before her surgery, continued for at least six months post operatively and continued and continues to affect her ability to move about.

210. Plaintiff has a disability to mobility, a major life function, for which she is protected under the ADA from discrimination.

211. The aforesaid actions of defendants in harassing plaintiff, creating a hostile work environment, refusing to grant plaintiff accommodations, requiring her to remain at home and lose almost two moths wages, subjecting plaintiff to unfair and abusive tactics, refusing to give her a teaching schedule that accommodated her short term medical needs, not acknowledging that plaintiff was acquitted of all disciplinary charges seeking plaintiff's termination, all taken to deny Plaintiff her tenure, attempt to force plaintiff to retire earlier than she would otherwise wish to, and were undertaken because of the plaintiff's disability, because she opposed defendants' illegal acts of disability discrimination, all in violation of the ADA.

30

212.   All of defendants' acts of discrimination and retaliation in violation of the ADA, were willful and intentional.

213.   Plaintiff has satisfied all of the procedural and administrative prerequisites to suit as set forth in 42 U.S.C. §§12111 *et seq.*

214.   As a result of the defendants' discrimination and retaliation against plaintiff on the basis of her disability, and opposition to discrimination, plaintiff has suffered lost wages, plus interest, and extensive inflicted pain and distress..

THIRD CLAIM
Pursuant to N.Y. State Human Rights Law

215.   Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 197 of the complaint with the same force and effect as though fully set forth herein.

216.   NY Human Rights Law Section 296 protects Plaintiff from discrimination based on upon age disability and retaliation for opposing said discrimination.

217.   Defendants' aforesaid acts of discrimination and retaliation constitute an unlawful discriminatory practice within the meaning of Section 296 of the Human Rights Law based on her age, disability, and retaliation for opposing said discrimination.

218.   As a result of the defendants' discriminatory acts, plaintiff has suffered lost wages and interest, and has suffered, continues to suffer, and will in the future suffer extreme embarrassment, humiliation, mental anguish, emotional distress, pain and suffering, and other non-pecuniary losses.

## FOURTH CLAIM
### Pursuant to N.Y. City Human Rights Law

219.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 197 of the complaint with the same force and effect as though fully set forth herein.

220.    Section 8-101 *et. seq.* of the New York City Administrative Code protects persons from discrimination and retaliation.

221.    Section 8-101 *et. seq.* of the New York City Administrative Code protects Plaintiff persons from discrimination and retaliation.

222.    Defendants' aforesaid acts of discrimination and retaliation constitute an unlawful discriminatory practice within the meaning of Section 8-101 *et. seq.* of the New York City Administrative Code because the discriminatory acts all occurred within the City of New York.

223.    As a result of the defendants' discriminatory acts, plaintiff has suffered lost wages plus interest, and has suffered, continues to suffer, and will in the future suffer extreme embarrassment, humiliation, mental anguish, emotional distress, pain and suffering, and other non-pecuniary losses.

## FIFTH CLAIM
### Pursuant to 42 U.S.C. §1983 (Due Process amd Equal Protection)

224.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 197 of the complaint with the same force and effect as though fully set forth herein.

225. Being brought up on false charges, Defendant Finley's *ultra vires* acts done under color of state law, creation of a hostile work environment, and discrimination in the terms and conditions of public employment on the basis of age, disability as well as retaliation for opposing discriminatory practices, by state actors, amount to a violation of the right to equal protection of the laws, as guaranteed by the 14th Amendment to the U.S. Constitution and violation of due process, as guaranteed by the 14th Amendment to the U.S. Constitution and Art. I of the New York State Constitution.

226. Defendants Klein, Finley, Reedy, Berman, and Paradis, have intentionally and invidiously discriminated against plaintiff with respect to her public employment because of her age and disability and retaliated against her for opposing age and disability discrimination.

227. Defendants Klein, Finley, Reedy, Berman and Paradis, participated directly in the violation of plaintiff's constitutional rights.

228. Defendants Klein, Finley, Reedy, Berman and Paradis, failed to remedy the violation of plaintiff's constitutional rights after being informed of it and/or created a policy or custom under which the unconstitutional practices occurred or allowed the continuance of such policy or custom and/or were grossly negligent in supervising subordinates who committed the wrongful acts and/or exhibited deliberate indifference by failing to act on information indicating that unconstitutional acts were occurring.

229. The discriminatory actions of the defendants were part of the policy or custom of the defendants, and were reviewed by and adopted by the defendants Department of Education, by virtue of their initiation of disciplinary charges against plaintiff on or about June 19, 2008 and other acts.

230.   By their actions, defendants have intentionally deprived plaintiff of valuable rights in public employment based on unlawful and discriminatory motives of age, disability and retaliation.

231.   All of defendants' actions were taken under color of State law.

232.   Defendants by their actions have violated plaintiff's right to equal protection of the laws and due process as provided by the 14th Amendment to the U.S. Constitution.

233.   Because of defendants' intentional acts, plaintiff has suffered lost wages and has suffered, continues to suffer, and will in the future suffer extreme embarrassment, humiliation, mental anguish, emotional distress, pain and suffering, and other non-pecuniary losses.

234.   Defendants have acted with malicious intent and/or with reckless or callous indifference to plaintiff's federally protected rights, entitling plaintiff to punitive damages.

SIXTH CLAIM
Tort – Negligent and Intentional Infliction of Emotional Distress

235.   Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 197 of the complaint with the same force and effect as though fully set forth herein.

236.   Plaintiff was subjected to public humiliation, false accusations, verbal abuse, harassment, loss of employment, conduct contrary to public policy, defamation, threat of bringing or prosecution of false charges used to coerce or force resignation, improper initiation and conduct of disciplinary actions, which are designed to prevent Plaintiff from the exercise of her rights to pursue vindication through the 3020-a procedures, and forced submission to embarrassing and unnecessary medical examinations.

237.  Defendants' aforesaid acts were part of a pattern through which Defendants sought to force Plaintiff to retire or quit.

238.  Defendants aforesaid acts were improper and unlawful.

239.  As a result of the defendants' aforesaid acts, plaintiff has suffered lost wages plus interest, and has suffered, continues to suffer, and will in the future suffer extreme embarrassment, humiliation, mental anguish, emotional distress, pain and suffering, and other non-pecuniary losses.

WHEREFORE, plaintiff respectfully requests that this Court:

(1)  adjudge and decree that defendants have violated the ADEA, 29 U.S.C. §§ 621 *et seq.*; ADA 42 U.S.C. §12111 *et seq.* and have done so willfully, that defendants have violated the State Human Rights Law, the City Human Rights Law and that defendants have violated 42 U.S.C. §1983 and that defendants have violated the New York State Constitution Article 1;

(2)  award plaintiff appropriate back pay, an equal sum as liquidated damages and pre-judgment interest in amounts to be proved at trial;

(3)  award compensatory damages for past and future extreme embarrassment, humiliation, mental anguish, pain and suffering, emotional distress, and other non-pecuniary losses arising from defendants' violation of plaintiffs' rights under the New York State Human Rights Law and New York City Human Rights Law in an amount to be determined at trial;

(4)  award compensatory damages for past and future extreme embarrassment, humiliation, mental anguish, pain and suffering, emotional distress, and other non-pecuniary

losses arising from defendants' violation of plaintiffs' rights to Due Process and Equal Protection under the U.S. Constitution, in an amount to be determined at the time of trial;

(5)     award punitive damages arising from the violation of 42 U.S.C. §1983 by defendants Klein, Finley, Reedy, Berman, and Paradis, individually, in an amount to be determined at trial;

(6)     award plaintiff the costs of this action, together with reasonable attorney's fees, as provided by the ADEA, 29 U.S.C. §626(b) and by incorporation, 29 U.S.C. §616(b), and as provided by ADA 42 U.S.C. §12111 *et seq*, and as provided by 42 U.S.C. §1988; and

(7)     grant plaintiff such additional equitable and legal relief as the Court deems just and proper in the circumstances.


Dated: New York, New York
       February 1, 2010

                                 JOY HOCHSTADT, P.C.
                                 300 CENTRAL PARK WEST
                                 NEW YORK, NEW YORK 10024
                                 Attorney for Plaintiff


                                 By: Joy Hochstadt (JH0935)

36